**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**ALONZO HATCHEL,**

      **Plaintiff,**

**vs.**                                    **CASE NO. 1:08CV168-MP/AK**

**MICHAEL J. ASTRUE,
Commissioner of Social Security**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act (Act) for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's applications under Title II for disability insurance benefits (DIB) prior to April 4, 2004.

Upon review of the record, the Court concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## A.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on July 8, 2002, alleging a disability onset date of November 1, 2000, because of back surgery. Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who conducted a hearing on April 7,

2005. The ALJ entered a partially favorable decision on October 27, 2005, finding that Plaintiff had become disabled on April 4, 2004, based on his age of 55. Therefore, Plaintiff was not eligible to receive either DIB or SSI benefits from November 1, 2000, through April 3, 2004; however, as of April 4, 2004, Plaintiff became eligible for SSI benefits. Plaintiff was not entitled to receive DIB benefits since he was not disabled before his date last insured of March 31, 2003 (DLI). (R. 562-576).

Plaintiff requested a review of the hearing decision on December 9, 2005. On June 29, 2006, the Appeals Council (AC) issued a decision affirming the finding that Plaintiff was disabled beginning April 4, 2004, and remanded the case to the ALJ for further consideration of the issue of disability prior to April 4, 2004. (R. 587-89). A Vocational Expert identified two groups of occupations that Plaintiff could perform, and it was not clear what specific occupations the Vocational Expert was referring to or the numbers of such jobs in the economy. (R. 588, 574). Additionally, Plaintiff's residual functional capacity (RFC) precluded exposure to cold temperatures, which is frequently required to perform the occupation of courier, one of the occupations suggested by the Vocational Expert. (R. 588). Finally, the hearing decision did not address a mental impairment or limitations, even though they were implied in one of the hypothetical questions to the Vocational Expert. (R. 588).

The Appeals Council instructed the ALJ that on remand the ALJ should (1) further consider Plaintiff's maximum mental residual functional capacity and provide appropriate rationale with references to evidence in support of assessed limitations; and (2) obtain supplemental evidence from a Vocational Expert to clarify the effect of Plaintiff's limitations on his occupational base and determine Plaintiff's transferable

**No. 1:08CV168-MP/AK**

skills, if any. The Council also instructed the ALJ (1) that hypothetical questions reflect the specific limitations established by the record as a whole; (2) that the Vocational Expert identify examples of appropriate jobs and state the incidence of such jobs in the national economy; and (3) that ALJ identify and resolve conflicts between the occupational evidence identified by the Vocational Expert and information in the Dictionary of Occupational Titles (DOT). (R. 587-89).

The ALJ conducted a hearing on May 11, 2007, and entered a partially favorable decision on July 23, 2007. On June 5, 2008, the Appeals Council denied Plaintiff's request for review, thus making the July 23, 2007 decision of the ALJ the final decision of the Commissioner. This action followed.

## B. FINDINGS OF THE ALJ

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act on March 31, 2003. (R. 23). Plaintiff did not engage in substantial gainful activity since November 1, 2000, the alleged disability onset date. (R. 23). The ALJ found that Plaintiff has the following severe impairments: degenerative disc disease with low back pain, hypertension, and gastroesophageal reflux disease. (R. 23-26). However, Plaintiff's impairments do not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.920(d)). (R. 26).

The ALJ found that Plaintiff had the residual functional capacity to perform light work with occasional balancing, stooping, kneeling, crouching, crawling, and climbing

ramps and stairs.  (R. 27-30).  Plaintiff could never climb ladders, ropes or scaffolds.
(R. 26).  Additionally, Plaintiff had no significant vision or hearing problems but should
avoid jobs such as telemarketer and dispatching.  (R. 26).  He should not be exposed to
cold temperatures, unprotected heights, or hazardous machinery.  (R. 26).

The ALJ also found that Plaintiff was unable to perform any past relevant work.
(R. 30).  On the alleged disability onset date, Plaintiff was 51 years old, and he was
"closely approaching advanced age."  (R. 30).  On April 4, 2004, Plaintiff attained 55
years of age, and his age category changed to an individual of advanced age under 20
C.F.R. §§ 404.1563, 416.963.  (R. 30).  Prior to April 4, 2004, the transferability of
Plaintiff's skills was not material to the determination of his disability because the
Medical-Vocational Rules supported a finding that Plaintiff was "not disabled," whether
or not he had transferable job skills.  (R. 30).  Beginning on April 4, 2004, Plaintiff was
not able to transfer any job skills to other occupations.  (R. 30).

The ALJ also found that prior to April 4, 2004, there was a significant number of
jobs in the national economy that Plaintiff could have performed.  (R. 30-31).  Beginning
on April 4, 2004, there was not a significant number of jobs in the national economy that
Plaintiff could have performed, considering Plaintiff's age, education, work experience,
and RFC.  (R. 31).  Plaintiff was not disabled prior to April 4, 2004, but became disabled
on that date and continued to be disabled through July 23, 2007, the date of the ALJ's
decision.  (R. 31).  Finally, Plaintiff was not disabled within the meaning of the Social
Security Act at any time through March 31, 2003, the date last insured.  (R. 31).

**No. 1:08CV168-MP/AK**

**C.**    **ISSUES PRESENTED**

Plaintiff argues:

1.    That the ALJ failed to comply with the Appeals Council's remand order dated June 26, 2006, by neglecting to (1) properly assess the severity of Plaintiff's mental limitations and other impairments, and (2) make findings as to Plaintiff's maximum mental residual functional capacity;

2.    That the ALJ failed to identify functional limitations for each severe impairment, and, therefore, the hypotheticals to the Vocational Expert were incomplete;

3.    That the finding that Plaintiff can perform jobs identified by the ALJ was not supported by substantial evidence because the job requirements found within the DOT were inconsistent with the ALJ's RFC, and, therefore, there was an unresolved conflict with the DOT;

4.    That the finding that Plaintiff had RFC to perform light work was not supported by substantial evidence because the evidence supported a finding of less than full range of sedentary work and required the ALJ to find Plaintiff disabled prior to April 4, 2004 pursuant to the Medical Vocational Rule 201.14.

The Commissioner responds by stating that the ALJ properly determined Plaintiff's severe impairments because (1) the record does not support a finding that Plaintiff had any mental limitations prior to his date last insured of March 31, 2003; (2)

**No. 1:08CV168-MP/AK**

the ALJ correctly gave little weight to the opinion of Dr. Hengstebeck; (3) the record supports a finding that Plaintiff did not have the severe impairments of carpal tunnel syndrome, cervical radiculopathy and knee conditions.

The Commissioner also claims that the ALJ's RFC determination is supported by substantial evidence because the record does not show that Plaintiff suffered from vomiting, dizziness, or headaches on a regular basis during the relevant time period. The ALJ was not required to include these limitations in the RFC or in his hypothetical questions to the Vocational Expert. Additionally, the record does not support a finding that Plaintiff had limitations in concentration or required a sit/stand option. The ALJ properly found that Plaintiff had sufficient balance to perform the walking and standing requirements of light work.

Finally, the Commissioner argues that the ALJ properly determined that Plaintiff could perform other work because the record does not support a finding that Plaintiff had any significant problems with hearing, vision, language skills, or math skills, and, therefore, there was no conflict between the Vocational Expert's testimony and the DOT.

The issue thus presented is whether the Commissioner's decision that Claimant was not disabled prior to April 4, 2004, is supported by substantial evidence in the record and decided by proper legal standards.

## D.   **STANDARD OF REVIEW**

**No. 1:08CV168-MP/AK**

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court.  The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  Findings of fact by the Commissioner which are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g).  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a preponderance.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if substantial evidence supports the findings of the Commissioner.  See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).  Unlike the deferential review accorded to the Commissioner's findings of fact, his conclusions of law are not presumed valid.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to provide the reviewing court

with an adequate basis for it to determine whether proper legal principles have been observed requires reversal. Id. (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairment?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant work?

5.   Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary. Plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work. If Plaintiff establishes that his impairment keeps him

No. 1:08CV168-MP/AK

from his past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir. 1990).

## E. SUMMARY OF PLAINTIFF'S RELEVANT MEDICAL HISTORY

### 1. Plaintiff's Relevant Medical History Prior to the Date Last Insured of March 31, 2003

Prior to November 1, 2000, the alleged disability onset date, Plaintiff underwent right ear surgery in 1981 that reportedly contributed to some diminishment of his hearing. (R. 532). Plaintiff first complained of back problems after he sustained a work injury in 1993. (R. 307-09). He underwent conservative care for roughly three years, before undergoing lumbar laminectomy at L5-S1 in October 1995. (R. 307-12). After the surgery, Plaintiff continued to complain of low back problems on multiple occasions: (1) in December 1995 (R. 303-04); (2) in April 1997 as a result of moving furniture (R. 281-82); (3) in January 1998 as a result of assault (R. 272-73); (4) in June 1998 as a

**No. 1:08CV168-MP/AK**

result of an altercation (R. 266-67); (5) in September 1999 (R. 247-48); and (6) in February 2000 as a result of lifting a heavy object.

In 2000, Plaintiff was followed in Golden Gate Health Clinic for mastoiditis and neck pain, which completely resolved prior to the alleged disability onset date. (R. 490, 498-507). In August 2000, the doctor also noted that Plaintiff had intermittent pain going down the right side of the neck and to the right arm and diagnosed Plaintiff with cervical radiculopathy. (R. 496, 449).

On November 1, 2000, the alleged disability onset date, Plaintiff re-injured his back at work. (R. 725). At the time, Plaintiff was also undergoing treatment for diverticulitis and hypertension, which contributed to his headaches, dizziness and vision changes. (R. 524-25, 529, 484-85, 510, 450-51, 438, 501-02, 496, 741-42).

After November 1, 2000, Plaintiff continued to complain of low back pain. He was initially released to light duty, but was unable to go back to work because even light work was too uncomfortable. (R. 478, 485, 491). During a follow-up visit on November 18, 2000, Plaintiff was referred to a neurological/neurosurgical specialist to evaluate his symptoms. At the time, the doctor also noted that Plaintiff was suffering from gastrointestinal symptoms, including mild abdominal discomfort and fecal incontinence. (R. 478).

In December 2000, Plaintiff treated with Eshan M. Kibria, M.D., regarding his lower back pain symptoms. (R. 453-58). Plaintiff denied psychiatric diagnosis, recent anxiety, stress and depression. (R. 457). MRI performed on 12/11/00 showed status

**No. 1:08CV168-MP/AK**

post bilateral wide decompression laminectomies at L5-S1 without stenosis or recurrent disc protrusion. (R. 455). Dr. Kibria released Plaintiff to full time work with a 15 lbs lifting limitation for four weeks and then recommended a trial of full duty. (R. 453-54). Dr. Kibria also recommended soft tissue therapy, including ultrasound, massage therapy and moist heat. (R. 453-54). It is unclear if Plaintiff complied with Dr. Kibria's therapy recommendations, as the record does not contain any notes or references to Plaintiff's subsequent therapy treatment.

In March 2001, Plaintiff fell as a result of an assault in a bar and re-injured his neck, back and chest. (R. 212-13). In April 2001, Sherrill Kelly, M.D., opined that Plaintiff was "disabled" because of significant chronic back pain. (R. 462-63). The doctor also noted marked tenderness over the lower lumbar spine, bilateral paralumbar spasm and positive straight leg raising on the right. At the time, Plaintiff was still not working. (R. 462-63).

In August 2001, Jaime Reyes, M.D., examined Plaintiff with reference to the complaints of left lower quadrant pain and diagnosed possible diverticulitis. (R. 205-06). The doctor noted that Plaintiff did not have any psychological problems. (R. 205).

In September 2001, Kenneth Berdick, M.D., performed a consultative physical examination of Plaintiff. (R. 532-33). Dr. Berdick noted that Plaintiff was experiencing paralumbar muscle spasms with some sacroiliac tenderness. (R. 532-33). Under normal circumstances Plaintiff appeared to function reasonably well, but activities involving a significant amount of heavy lifting, bending and carrying could exacerbate

**No. 1:08CV168-MP/AK**

his low back pain syndrome. (R. 533). The doctor also noted that although Plaintiff had diminished hearing in his left ear, he could hear normally normal conversational tones in a quiet room. (R. 533).

In March 2002, Plaintiff continued to complain of back pain, which was accompanied by mild tenderness in the low lumbar area. (R. 199-201). During a consultative physical examination in August 2002, Rotimi Samuel, M.D., noted a limited range of motion of the spine with positive leg raising. (R. 359, 361-62). Imaging of Plaintiff's spine revealed degenerative changes in the lumbar area. (R. 124, 360).

In November 2002, Plaintiff fell from a deck and sustained injuries to his right knee, right hip and lower back. (R. 110). He also complained of headaches. (R. 110). The doctor noted no significant history of headaches. (R. 110). Radiographic imaging did not show any acute fractures. (R. 111).

Plaintiff re-injured his back and right knee when a wild hog charged him during a feeding in December 2002. (R. 125-33). Spinal imaging revealed no acute abnormalities and only mild degenerative changes. (R. 134). The imaging also revealed minimal degenerative changes in the right knee. (R. 134). In March 2003, Plaintiff presented to a doctor with diffuse tenderness to light touch over the lumbosacral spine and paraspinal muscles to the left. (R. 156-57). Plaintiff's pain was relieved with intravenous fluids and morphine. (R. 156-57).

**No. 1:08CV168-MP/AK**

**2.      Plaintiff's Relevant Medical History After the Date Last Insured of March 31, 2003 And Before April 4, 2004, the Adjudicated Disability Onset Date**

In August 2003, Plaintiff presented to an emergency room with complaints of headache on and off for six months and high blood pressure of 202/113.  (R. 345).  Plaintiff was admitted for cardiac catheterization.  (R. 332-35).  Plaintiff also underwent a CT scan of the brain, which was unremarkable.  (R. 343).  The doctors felt that the headache was most likely migrainous and should be treated with Imitrex.  (R. 343).

In October 2003, Plaintiff complained of shortness of breath, which was evaluated by Jose R. Marquina, M.D., F.C.C.P.  (R. 356-57).  The doctor ordered pulmonary function tests and a high-resolution CT scan of the chest, noting hat Plaintiff's shortness of breath may have been caused by either interstitial lung disease or asbestosis.  (R. 357).  The record does not contain the results of the tests or notes from Plaintiff's subsequent treatment with Dr. Marquina.

Also in October 2003, Richard A. Howard, M.D., evaluated Plaintiff in reference to his hypertension and chest pain complaints.  (R. 378-70).  The doctor opined that Plaintiff's chest pain could be due to hypertensive heart disease or a GI cause, with the latter more likely given Plaintiff's medical history.  (R. 370).  The doctor also noted that Plaintiff's blood pressure was still elevated and recommended the increase of the medication.  (R. 370).

**No. 1:08CV168-MP/AK**

From December 2003 until January 2004, Plaintiff was treated for a right ear infection, otitis externa. (R. 394-401). He also continued to complain of chest pain and shortness of breath. (R. 394).

**3.     Plaintiff's Relevant Medical History After April 4, 2004, the Adjudicated Disability Onset Date**

In September 2004, Plaintiff aggravated his back condition during activities and complained of discomfort in the lower lumbar area with radiation to the left leg. The impression was chronic low back pain with acute exacerbation. (R. 618).

In March 2005 , Plaintiff aggravated his back condition when he was walking down the steps (R. 546), continued to complain of abdominal pain and rectal bleeding, and underwent a colonoscopy (R. 547-58). He also reported being off his medication and experienced elevated blood pressure. (R. 559-61). His hearing was evaluated for hearing aids (and not diagnostically for medical treatment), and his abilities to hear instructions on the job and hear a telephone were noted to be moderately impaired. (R. 542). Plaintiff was found to have no impairment in his ability to hear sirens and horns. (R. 542). Plaintiff was recommended for hearing aids. (R. 542).

In March 2006, William Guy, M.D., noted Plaintiff had benign essential hypertension. (R. 616). Plaintiff continued to have elevated blood pressure in July 2006 (R. 628) and in April 2007 (R. 644).

In July 2006, Jesse Lipnick, M.D., noted that Plaintiff had right greater than left paralumbar muscular rigidity with reduce range of motion in flexion, extension, side

**No. 1:08CV168-MP/AK**

bending, and rotation. (R. 627). Spinal extension exacerbated Plaintiff's back pain and spinal flexion relieved it. (R. 627). Plaintiff's strength and sensation were reduced in the right lower extremity. (R. 627).

EMG testing in August 2006 showed distal symmetric sensory rather than motor polyneuropathy, consistent with a history of alcohol intake. (R. 622-24). The examination showed no evidence of radiculopathy or peripheral nerve entrapment in the legs. (R. 623).

Between October 2006 and April 2007, Plaintiff was treated for chronic itching, vomiting and flu like symptoms. (R. 644-56). In May 2006, Plaintiff exacerbated his back condition when he slipped on some water. (R. 614-15). In April 2007, Plaintiff reported he injured his neck and back when he slipped at home. (R. 646).

In May 2007, Physician's Assistant Kelly Cole and Elizabeth Hengstebeck, M.D., prepared a Medical Source Statement and concluded that Plaintiff was not able to perform even sedentary work and was disabled from substantial work. (R. 632-38). During the same month, Jesse Lipnick, M.D., opined in Medical Source Statement that Plaintiff could lift less than ten pounds and stand/walk at least two hours in a workday, but stated he did not know how long Plaintiff could sit (R. 639-43). The doctor believed Plaintiff could push/pull at the light duty level (R. 640); however, he then stated Plaintiff needed frequent breaks of ten minutes every two hours (R. 641). The doctor was unsure and failed to comment on multiple questions posed in the Statement. (R. 639-43).

**No. 1:08CV168-MP/AK**

F.     SUMMARY OF THE ADMINISTRATIVE HEARING

A hearing was held on Plaintiff's application on May 11, 2007.  Plaintiff was 58 years old at the time of the hearing, had an 8th grade education, and last worked in 2000.  (R. 722, 723, 726).  In 1990s, Plaintiff underwent back surgery.  In November 2000, Plaintiff aggravated his back condition when he was mixing stamp concrete. Even though it was a work-related condition, Plaintiff did not receive any workers' compensation payments for it.  (R. 725-26).

Plaintiff's pain level changes during the day, and he has probably three good and four bad days in one week.  (R. 738).  As the result of his back condition, on a bad day Plaintiff is able to sit for ten to fifteen minutes without severe pain, and then he needs to stand up.  (R. 728, 736, 738).  Plaintiff is able to stand for about fifteen to twenty minutes before he starts experiencing pain again.  (R. 728, 736, 738).  He can walk up to twenty yards before he starts experiencing pain.  (R. 728, 736-37, 738).  His ability to walk is limited by both his back and knee condition.  (R. 739-40).  Plaintiff injured his knee prior to March 2003 and the knee still "bothers him."  (R. 739-40).

On a good day, Plaintiff's limitations are consistent with the testimony at the previous hearing that took place on April 7, 2005.  (R. 737-38).  At the time, Plaintiff testified that he was able to walk for a quarter mile, that he could stand for three hours and that he read a lot.  (R. 737).

Plaintiff also experiences shaking and numbness in his hands which is due to carpal tunnel syndrome.  (R. 729).  This was diagnosed by a doctor from Naples prior to

**No. 1:08CV168-MP/AK**

March 2003, but Plaintiff did not opt for surgery because of his financial situation. (R. 729-31).

Plaintiff estimated that he can lift less than ten pounds; he would not be able to lift a gallon of milk. (R. 728-29). His lifting capacity is limited mainly as the result of his back condition and not the carpal tunnel syndrome. (R. 731).

In the six months to a year prior to the hearing, Plaintiff had been treating his back condition with Methadone, which made him feel sick. (R. 731-32, 748-49). Plaintiff has also been taking a muscle relaxer, Flexeril. (R. 749). Prior to March 2003, Plaintiff took Lortab, which also caused the same side effects. (R. 732). He was also taking Phenergan to control sickness. The medications caused fatigue. (R. 732-33). During the previous hearing, Plaintiff testified he was also taking Percocet every three days; now he is taking it more frequently. (R. 749).

Between November 2000 and March 2003, in the morning after breakfast and in the afternoon, Plaintiff would lie down for about an hour to rest. (R. 733). That period of rest was in addition to a break he would normally take to eat. (R. 733).

Between November 2000 and March 2003, Plaintiff would rate his pain as "a constant seven" on a scale of one to ten, with ten being the most severe. (R. 734). Plaintiff was able to concentrate on an activity for about ten to fifteen minutes before his pain would interfere with the activity. (R. 734). After the ten to fifteen minutes, Plaintiff would lie down. (R. 734-35).

Plaintiff does not read too much because of his concentration problems. (R.

734, 737).  Plaintiff testified that he also has memory problems as a result his

concentration issues; he would not be able to remember a phone number that someone

tells him if he does not have a pencil to write it down.  (R. 735).

Plaintiff has almost no hearing in his right ear and this is not corrected with a

hearing aid because he did not have insurance that would cover it.  (R. 735, 738).  If

Plaintiff is in a room with a group of people and they do not have loudspeakers, he is

not able to understand well what they say; he has to ask them to repeat.  (R. 736).

Plaintiff has difficulties hearing instructions coming from his right side.  He corrects this

by moving his head and keeping his left side to the people talking to him.  (R. 738-39).

Plaintiff has also been suffering from high blood pressure, which has never been

completely under control in spite of the medication he takes.  (R. 740-41).  Currently,

this condition is controlled with Atenolol.  (R. 741-42).  The high blood pressure causes

him to experience dizziness and fainting spells, which occur every other day and last

about an hour to two hours.  (R. 741-42).  If Plaintiff gets dizzy, he lies down and takes

either a water pill or an Atenolol.  (R. 742).

Plaintiff has also been suffering from a neck condition, which contributes to his

headaches and interferes with his walking by "jarring" his back.  (R. 741-43).  This is a

relatively recent development and he was not suffering from it prior to March 2003.  (R.

743-44).

Plaintiff has been frequently suffering from shortness of breath, which is caused

by his "bad lungs" caused by COPD, which was diagnosed in 2003 or 2004 by a Dr.

**No. 1:08CV168-MP/AK**

Martin or Martinez in Naples.  (R. 744-45).  He becomes symptomatic when he walks or performs other activities.  (R. 745).

Plaintiff's GERD also affects his daily activities by making him vomit, which happens every other day.  (R. 745-46).  He received treatment for this condition prior to March 2003 and was prescribed Protonix, which stopped the vomiting spells.  (R. 747-48).  Plaintiff does not think this is a disabling condition.  (R. 748).

Three different hypothetical questions were posed by the judge to the vocational expert during the administrative hearing.  (R. 755-60).  The first hypothetical pertained to an individual with no transferable skills and with a residual functional capacity to perform light work with the following limitations: (1) ability to lift and carry twenty pounds occasionally and ten pounds frequently; (2) ability to stand and walk for six hours in an eight-hour workday; (3) ability to perform occasional postural activities; (4) no significant push and pull limitations; (5) no climbing of ladders, ropes or scaffolds; (6) no hearing abilities to perform a telemarketer or dispatcher type of job; (7) no exposure to extreme temperatures; (8) no exposure to unprotected heights; (9) no exposure to hazardous machinery; and (10) the individual would experience pain but it would not interfere with his abilities to perform activities.  (R. 756-57).  The expert responded that this individual would not be able to perform any of Plaintiff's past relevant work, which included a wharf laborer, an operating engineer, a construction worker I and a construction worker II.  (R. 757, 754-55).  However, the individual would be able to perform a number of

other light category jobs, such as a small products assembler, a produce inspector and a line inspector.  (R. 757).

The second hypothetical posed by the judge to the vocational expert pertained to an individual with the same residual functional capacity as in the first hypothetical with the additional limitation of a sit/stand option available at will.  (R. 758).  In response, the vocational expert stated that such an individual would be able to perform a job of a small products assembler, a produce inspector and a line inspector.  (R. 758).  The number of available positions for the line inspector position would be reduced in the local Fort Meyers area.  (R. 758).

The third hypothetical posed by the judge to the vocational expert pertained to an individual with the same residual functional capacity as in the second hypothetical with the additional limitation of  frequent pain at a severe level, which would interrupt the individual's ability to perform tasks in a timely manner and affect his concentration in a similar fashion.  (R. 758).  The vocational expert stated that such an individual would not be able to perform any jobs.  (R. 758).

The fourth hypothetical posed by Plaintiff's attorney to the vocational expert pertained to an individual with the same residual functional capacity as in the second hypothetical with the additional limitation of the need to rest for an hour in the morning and an hour in the afternoon (in addition to a lunch break).  The vocational expert stated that such an individual would not be able to perform any jobs.  (R. 759).  This opinion

would not change if the individual had to lie down due to his dizziness for an hour and a half in the morning and an hour and a half in the afternoon. (R. 759).

The fifth hypothetical posed by Plaintiff's attorney to the vocational expert pertained to an individual with a residual functional capacity limited by (1) the ability to lift less than ten pounds; (2) the ability to stand for two hours in an eight-hour day; and (3) the need to take breaks for ten minutes every two hours in addition to the usual breaks during lunch time, in the morning and in the afternoon. (R. 759-60). The vocational expert stated that such an individual would be able to perform some sedentary jobs. (R. 760).

If the individual needed additionally (1) to alternate sitting and standing to relieve the pain, (2) to do handling, fingering, feeling and reaching activities for less than one-third of an eight-hour day, this would eliminate all three of the jobs that the vocational expert suggested. (R. 760).

## G.    DISCUSSION

### a)    Appeals Council Remand

The AC order directed the ALJ to further consider Plaintiff's mental capacity and make appropriate references to evidence to support any limitations and the ALJ did not take this action or explain why he did not do as instructed. However, the Court finds that this is harmless error, because even if the ALJ addressed this issue in his decision he could not have created evidence of Plaintiff's mental condition prior to March 31, 2003, and the evidence of record that the ALJ had before him established no mental

limitations whatsoever.  An error by the ALJ will be held harmless if the evidence is strong enough to support the outcome despite the lapse.  Lubinski v. Sullivan, 952 F.2d 214, 216 (8th Cir. 1991); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983).

The ALJ correctly gave little weight to Physician's Assistant Kelly Cole and Elizabeth Hengstebeck, M.D.'s Medical Source Statement.  A treating physician is defined as a "medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 CFR §404.1502.  Acceptable medical sources are licensed physicians, psychologists, optometrists, and pediatrists.  20 CFR § 404.1513. Other sources may be used to show the severity of the impairment and how it affects the ability to work, which include nurse practitioners, physician's assistants, naturopaths, chiropractors, and therapists.  20 CFR § 404.1513.

20 CFR §§ 404.1527(d(2)(I), 416.927(d)(2)(I) provides: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source."

With regard to Dr. Hengstebeck, Dr. Hengstebeck's name does not appear on any of Plaintiff's office visit notes.  Rather, Plaintiff was seen on a regular basis by Physician Assistant, Kelly Cole.  Dr. Hengstebeck's involvement in Plaintiff's treatment

**No. 1:08CV168-MP/AK**

appears to be limited to signing the Medical Source Statement, which may or may not have been accompanied by her examination of Plaintiff. Contrary to Plaintiff's assertion, therefore, Dr. Hengstebeck's opinions need not be afforded great weight under the treating physician's rule. See Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) (noting that rule giving great weight to physician's opinion does not apply where physician has only examined patient one time).

Prior to the date last insured of March 31, 2003, the evidence does not establish that Plaintiff suffered from any mental limitations. The majority of Plaintiff's treatment pertains to his lower back and gastrointestinal symptoms. The only reference to Plaintiff's mental condition is Dr. Kibria's notation that Plaintiff reported that he was not suffering from anxiety, stress and depression. The fact that Plaintiff sought no medical treatment for his alleged mental problems militates against a finding of severity of these alleged impairments. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

Thus, while it appears it may have been error not to follow the mandatory language of the Appeals Council Affirmation and Order Remanding the Case to the ALJ, the end result would not have been different.

b)    Incomplete hypotheticals to the Vocational Expert

At the fifth step of the evaluation process, the ALJ must determine whether a Claimant, based on his residual functional capacity, age, education and work experience, can adjust to other work in the national economy. 20 C.F.R. §

**No. 1:08CV168-MP/AK**

404.1520(a)(4).  The ALJ may make this determination by reliance upon the Medical

Vocational Guidelines or by utilizing the services of a vocational expert.  Phillips v.

Barnhart, 357 F.3d 1232, 1239 (11th Cir. 2004).  The Eleventh Circuit has "recognized

that the grids may be used in lieu of vocational testimony on specific jobs if none of

claimant's nonexertional impairments are so severe as to prevent a full range of

employment at the designated level."  Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir.

1996) (quoting Passopulos v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992)).  See also

Foote v. Chater, 67 F.3d 1553, 1558 (11th Cir. 1995).  "It is only when the claimant can

clearly do unlimited types of  work . . . that it is unnecessary to call a vocational expert

to establish whether the claimant can perform work which exists in the national

economy."  Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989) (citation omitted).

Exclusive reliance upon the grids is not appropriate when claimant has a nonexertional

impairment that significantly limits his basic work activities.  Swindle v. Sullivan, 914

F.2d 222, 226 (11th Cir. 1990).

When the ALJ uses a vocational expert, he elicits responses from the expert by

posing hypothetical questions to him or her.  Phillips, 357 F.3d at 1240.  In order for the

expert's testimony to constitute substantial evidence to support the ALJ's findings with

regard to this point, the ALJ must pose a hypothetical which includes all of Claimant's

impairments.  Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).  However, the ALJ

is only required to pose those limitations he finds severe in the hypothetical to the

expert.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).


**No. 1:08CV168-MP/AK**

Even though the ALJ found that Plaintiff suffered from degenerative disc disease with low back pain, hypertension, and GERD disease, the ALJ properly formulated hypotheticals to the vocational expert. Because of drastic differences in Plaintiff's testimony during the first and the second hearing, the ALJ found his statements concerning the intensity, persistence and limiting effects of these symptoms not entirely credible.

The evidence showed that prior to the date last insured of March 31, 2003, Plaintiff had impairments that were capable of creating limitations on his ability to function; however, it did not support the severe functional limitations that Plaintiff alleged. In reference to Plaintiff's lower back condition, the examinations generally showed normal strength, intact sensation, and equal and symmetric deep tendon reflexes throughout. Straight leg raising was generally negative and gait was repeatedly noted to be normal without an assistive device. With regard to Plaintiff's hypertension, a full cardiac work-up, including a catheterization, showed no significant findings. The evidence does not show that Plaintiff complained of dizziness and fainting spells at the rate he testified to.

As far as GERD is concerned, diagnostic studies revealed no sign of ischemic changes or abdominal obstruction in December 2000. The record shows that Plaintiff received medication therapy with good results and was discharged in improved condition. According to the record, Plaintiff next sought treatment of his GERD in March 2002, when he was treated again with appropriate medication. The fact that Plaintiff

**No. 1:08CV168-MP/AK**

relatively rarely sought medical treatment for his GERD condition militates against a finding of severity of this alleged impairment.  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). Additionally, the ALJ is not required to include in his hypothetical any medical conditions which are controlled by medication.  McSwain v. Bowen, 814 F.2d 617, 619-20 (11th Cir. 1987). Accordingly, the ALJ properly formulated hypothetical questions to the vocational expert and found that there were jobs existing in the national economy that Plaintiff was able to perform.

       c)      Substantial evidence of DOT job requirements

     Plaintiff argues that he suffered from an inability to tolerate loud noises; his balance was compromised and therefore he could not perform the standing requirements of light work; his language and math skills were not proficient enough for the jobs identified; and his visual acuity was limited.  Plaintiff argues that whenever there is a conflict between the DOT listing requirements and the vocational expert, the ALJ must bring the conflict to the attention of the expert and have him provide a reasonable explanation for the conflict.  Further, Plaintiff argues that Social Security Ruling (SSR) 00-4p mandates that the ALJ make an independent analysis and resolve the conflict on the record by determining whether the expert's explanation is reasonable. Plaintiff also argues that the Eleventh Circuit has a high standard the ALJ must follow before finding that a vocational expert's opinion "trumps" the DOT listing requirements, citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).  However, the Eleventh

Circuit has more recently held that <u>Jones</u> establishes that the testimony of a vocational

expert trumps the DOT whenever an inconsistency arises and whether or not the ALJ

resolves any conflict, and SSR 00-4p is binding only on the agency, not the Court.

<u>Miller v. Commissioner</u>, 246 Fed. Appx. 660 (11th Cir. 2007).

Thus, there is no merit to this argument.

d)    <u>Light v. Sedentary work</u>

Plaintiff argues that the evidence did not support a finding of capacity for light

work, based on Plaintiff's ability to only occasionally balance.  The ALJ found that

Plaintiff's RFC to perform light work was limited to occasional balancing (R. 27), with

walking and standing requirements of light work activity (R. 27-29).  In making those

determinations, the ALJ relied on the opinion of Dr. Kibria and the state agency medical

consultants, giving those opinions great weight (R. 28-29).

At the same time, the ALJ gave little weight to the opinions of a physician at the

Urgent Care Center, Dr. Lipnick, Physician's Assistant Cole and Dr. Hengstebeck.  The

physician at the Golden Gate Urgent Care Center treated Plaintiff immediately after the

accident and recommended Plaintiff remain off work pending further evaluations in

reliance on Plaintiff's subjective complaints and did not reiterate this opinion after the full

work-up was done.

Dr. Lipnick treated Plaintiff starting from 7/24/06 (R. 625-631) and was unable to

address Plaintiff's disability status before 3/2003 (R. 643).  Dr. Lipnick was unsure of his

answers and left many questions unanswered in his Medical Source Statement. (R.

**No. 1:08CV168-MP/AK**

639-643). Additionally, his objective findings of tenderness, reduced range of motion over the lumbar spine, decreased strength and sensation in the right lower extremity, with otherwise intact strength, sensation and reflexes and negative straight leg raising do not support an ability to stand/walk for only two hours in a workday and a lifting limitation of ten pounds.

Even though Physician's Assistant Cole and Dr. Hengstebeck opined that Plaintiff could not perform even sedentary work and was disabled from substantial work, the ALJ correctly gave little weight to this opinion, as Plaintiff was treated for his back impairment on only two occasions. In both instances, he exacerbated his condition by slipping. The evidence did not show any findin gs that would support an inability to perform sedentary work. Additionally, as discussed above, Dr. Hengstebeck's name does not appear on any of Plaintiff's office visit notes.

The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996). It must

**No. 1:08CV168-MP/AK**

determine only if substantial evidence supports the findings of the Commissioner.  See

Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial

evidence exists which is contrary to the Commissioner's findings, where there is

substantially supportive evidence of the Commissioner's findings, the court cannot

overturn them.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner denying benefits prior to March 31, 2003,

be **AFFIRMED**.

At Gainesville, Florida, this _**25**<sup>th</sup>_ day of January, 2010.


_s/ A. KORNBLUM_
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**


**No. 1:08CV168-MP/AK**